## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMIE CONNELL, as Administratix of ) <br> The Estate of Karen Champagne, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> BRK BRANDS, INC., ) <br> Defendant. ) <br> ) | **CIVIL ACTION** <br> **NO. 10-12101-TSH** |

## MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 63&72)

### August 1, 2013

**HILLMAN, D.J.**

### Background

Jamie Connell, as Administratix of the Estate of Karen Champagne ("Plaintiff") has filed State law claims against BRK Brands, Inc. ("BRK" or "Defendant") for negligence (Count I), Wrongful Death pursuant to Mass.Gen.L.ch. 229, §2 (Count II), Breach of Express Warranty (Count III), Breach of Implied Warranty (Count IV), Breach of Implied Warranty of Merchantability (Count V); Breach of Implied Warranty of Fitness For A Particular Purpose (Count VI), Strict Liability (Count VII), Misrepresentation (Count VIII), and Property Damage (Count IX).   Plaintiff alleges that the death of decedent, Karen Champagne ("Ms. Champagne") was caused by BRK's ionization only smoke detector which was installed in her residence.

This Memorandum and Order of Decision addresses: (1) Plaintiff, Jamie Connell's, Administratix of the Estate of Karen Champagne, Motion for Partial Summary Judgment on Collateral Estoppel Grounds as to BRK's Negligence and the Defectiveness of BRK Ionization Smoke Detectors (Docket No. 63), and (2) Defendant BRK Brands, Inc.'s Motion for Summary Judgment (Docket No. 72).

**<u>Standard of Review</u>**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp*., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153.   The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152.   "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'"   *Id.* (citation to quoted case omitted).   "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial."

2

*Id.* (citation to quoted case omitted).    The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*   (citation to quoted case omitted).   "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## Facts

### *Background on Smoke Alarms and the Fire Protection Profession*

There are two basic types of smoke alarms on the market today: ionization and photoelectric.   Both types of smoke alarms contain sensing chambers that trigger a horn when a sufficient volume of smoke enters the chamber.   Ionization chambers contain a small radioactive isotope that creates an electric charge in the chamber that varies as smoke enters the chamber. When the differential in the charge reaches a preset limit, the alarm's integrated circuit sends a signal that activates the horn.   Photoelectric sensors operate by generating a perpetual light beam inside the chamber. Smoke entry scatters the beam and causes the light particles to contact sensors placed throughout the chamber. When the number of particles striking the sensors reaches a preset limit, the horn is activated.

Underwriters Laboratory ("UL")[1]  has stated that, "[w]hile photoelectric smoke alarms generally respond faster to smoldering fire conditions and ionization smoke alarms generally respond faster to flaming fire conditions, both types provide adequate protection against fire." *See Def BRK Brand's, Inc.'s Mem. of Reasons In Supp. of Its Mot. for Sum. J.* (Docket No. 73)(*"Def's Mem."*), at *Ex. L.*

---

1  " 'UL' is an independent product safety certification organization accredited for safety testing by the Occupational Safety and Health Administration. If a product bears the UL mark, it is an indication to the public that it meets certain safety requirements. *In re GuildMaster, Inc.*, 12-62234, 2013 WL 1331392 (Bankr. W.D. Mo. Mar. 29, 2013).

UL 217 is the standard for the manufacture and performance of smoke alarms. *See Generally Id.*, at *Ex. B* (UL 217). Despite the differences in sensing technology, all smoke alarms must pass the same series of tests at a qualified testing laboratory to comply with the nationally recognized standard for smoke alarm performance. *Id.*

The National Fire Protection Agency ("NFPA") promulgated the standard that governs the installation and maintenance of smoke alarms in residential construction ("NFPA 72"). *See Def's Mem.*, at *Ex. C.* At all times relevant hereto, the Massachusetts State Building Code ("MSBC") adopted NFPA 72, requiring that only UL certified smoke alarms be installed in residences, that smoke alarms be installed in the immediate vicinity of bedrooms and in all bedrooms, and that residents maintain the alarms in accordance with the manufacturers' instructions and NFPA 72. *See* 780 CMR 3603.16.3; 780 CMR 3603.16.10 (6th ed. effective February 28, 1997).   In 1998 when Ms. Champagne's residence was built, the MSBC additionally required the installation of photoelectric smoke alarms located within 20 feet of a kitchen or bathroom.   Chicopee, Massachusetts, the site of the fire in this case, follows the MSBC.

As an inherent characteristic, ionization sensing chambers are generally more sensitive to small smoke particles, which are produced in greater quantities when a fire is flaming while photoelectric sensing chambers are more sensitive to large smoke particles which are generated in greater quantities in smoke from a smoldering heat source.   There are smoldering fires that emit the size and type of particles to which ionization alarms respond just as quickly, or faster, than photoelectric alarms.   Smoke from every type of fire or heat source, however, generates both small and large smoke particles. Despite the differences in sensing technology, all smoke alarms must pass the same series of tests at a qualified testing laboratory to comply with the nationally recognized standard for smoke alarm performance, UL 217.

4

The Consumer Production Safety Commission ("CPSC ") also endorses the use of smoke detectors in residences, and it is the official position of the CPSC that, "[b]oth ionization and photoelectric detectors are effective smoke sensors." *Def's Mem.*, *Ex. M,* at p. 170. The CPSC acknowledges that the two different types of smoke alarms may perform differently depending on the type of fire: ionization smoke detectors respond more quickly to flaming fires that have smaller combustible particles, while photoelectric alarms generally respond more quickly to smoldering fires. *Id.*

The Federal Emergency Management Agency ("FEMA") has published the following statement:

> There are two types of home smoke alarms available; the ion type and the photoelectric type. The ion type reacts faster to open flaming fires and is usually the least expensive. The photoelectric type reacts faster to smoldering fires and is less likely to react to cooking. Both types provide good protection and can be used without worry.

*Id.*, *Ex. N*, at p. 185.

At all times material hereto, including when the alarms inside Ms. Champagne's residence were purchased and installed, BRK designed, manufactured and offered for sale smoke alarms that utilized ionization smoke detection technology, photoelectric smoke detection technology and alarms that utilize both ionization and photoelectric smoke detection technology.   Ionization alarms are the least expensive smoke alarms, followed by photoelectric alarms; dual alarms are the most expensive.

### *Ms. Champagne's Death and Residence*

Ms. Champagne lived alone in a mobile home manufactured in 1998 located at 25 Festival Circle, Chicopee, Massachusetts.   On the evening of December 17, 2007, Ms. Champagne was

home alone. Late in the evening, a fire started in her bedroom from a lit cigarette that was left in her bed.   A truck driver on a nearby roadway noticed the fire, called 911 at approximately 11:59 p.m., and the fire department arrived at the home at 12:04 a.m. The firefighters who responded to the fire discovered Ms. Champagne, unconscious, at the entry to a utility room of her mobile home that contained a fire extinguisher.   Ms. Champagne remained unconscious until December 19, 2007 when she died of hypoxic brain injury due to carbon monoxide.   Ms. Champagne was never able to provide any information concerning her location at the time of the fire, when or how she learned of the fire, or what actions she took as a result of the fire.

Ms. Champagne had previously suffered brain trauma as the result of an assault that occurred many years prior to the fire, leaving her permanently disabled.   Trazodone, an antidepressant medication that had been prescribed for Ms. Champagne was recovered from the home following the fire.

At the time of the fire, the residence contained two BRK model 86RAC smoke alarms – one outside the master bedroom, and the second outside the spare bedroom.   Inspection revealed that the master bedroom alarm was manufactured in or around 1998.   The master bedroom alarm sounded at some point during the fire.   It is not known when during the fire the smoke alarm sounded.

The master bedroom alarm was located within 20 feet of the kitchen.   As I have previously found, at the time, the MSBC required that smoke alarms installed within 20 feet of a kitchen be photoelectric alarms. Additionally, there were no smoke alarms installed inside the bedrooms. The 1996 edition of NFPA 721, the MSBC, and BRK's 86RAC User's Manual all instructed that smoke alarms should be installed *inside* bedrooms.

The ceiling above the wall where the smoke alarms were installed sloped downward toward the rear wall of the home.   The ceiling in the master bedroom also was sloped.   The alarm outside the master bedroom was located on the wall 33 inches down from where the wall met the ceiling, and the alarm outside of the spare bedroom was similarly located on the wall 35 inches from where the wall met the ceiling.

In homes with sloped ceilings, NFPA 72 guidelines and the manufacturer's (BRK's) instructions, require alarms to be placed on the ceiling, "on the high side of the room", "within 3 feet of the peak of the ceiling measured horizontally." *Def's Mem.*, *Ex. C*, at p. 84; *see also Ex. F* (BRK User's Manual for the 86ARC), at p. 94.

As stated above, the smoke alarms located in Ms. Champagne's residence on the night of the fire have been identified as being model number 86RAC manufactured in 1998.   These smoke alarms were UL listed and met or exceeded all standards applicable to residential smoke alarms, namely UL 217.

In the model 86RAC smoke alarm, the battery door would not close unless there was a battery inside.   Affixed to the battery drawer of the alarm was a bright orange sticker with black lettering that read:

> **WARNING**
> REPLACE BATTERY
> DRAWER WILL NOT CLOSE
> WITHOUT A BATTERY.
> USE SPECIFIED BATTERIES ONLY. OTHER BATTERIES
> MAY CAUSE IMPROPER OPERATION. USE A 9 VOLT
> BATTERY. EVEREADY
> 216, 522, OR 1222.
> DURACELL MN1604.
> REPLACE DETECTOR BY
> THE YEAR 2005

The user's manual for the 86ARC smoke alarm included the following:

### Limitations Of Smoke Alarms
....
**Smoke alarms cannot detect fires if the smoke does not reach them.** Smoke from fires in chimneys or walls, on roofs, or on the other side of closed doors may not reach the sensing chamber and set off the alarm. That is why one unit should be installed inside each bedroom or sleeping area – especially if bedroom or sleeping area doors are closed at night – and in each hallway between them.
....
**Smoke alarms may not have time to alarm before the fire itself causes damage**, injury or death, since smoke from some fires may not reach the unit immediately. Examples of this include persons smoking in bed, children playing with matches, or fires caused by violent explosions resulting from escaping gas.

*Def's Mem.*, at *Ex. F* (emphasis in original).   Additionally, the back page of the manual provided, in pertinent part: "Follow safety rules, and prevent hazardous situations: 1) Use smoking materials properly. Never smoke in bed." *Id.*, at p. 92.

### Discussion

#### *Plaintiff's Motion For Partial Summary Judgment*

Plaintiff seeks to have this court apply non-mutual issue preclusion to prevent BRK from litigating the issue as to whether BRK's ionization only smoke detector which was installed in Ms. Champagne's residence was defective and whether BRK was negligent in the manufacture and/or design of the smoke detector. In support of her argument, Plaintiff cites to *Hackert v. First Alert, Inc.*, No. 1:03-CV-216, in which a judgment entered in the plaintiffs' favor against BRK in an action brought in the United States District Court for the Northern District of New York. BRK argues, on multiple grounds, that collateral estoppel should not apply in this case.

Collateral estoppel prevents needless re-litigation in subsequent actions of issue(s) decided in an earlier action.   It can protect litigants from having to re-litigate an identical issue against the

9

same party or a person in privity with such party. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322,

326, 99 S.Ct. 645, 649 (1979).   More specifically, the doctrine of collateral estoppel "relieve[s]

parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources and, by

preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v McCurry*, 449

U.S. 90, 94, 101 S.Ct. 411 (1980).

Federal law governs whether a federal court should give preclusive effect to a prior federal

court adjudication.   *Faigan v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999).   The party invoking issue

preclusion has the burden of establishing that all necessary elements have been satisfied.   A

plaintiff seeking to invoke non-mutual collateral estoppel, more commonly referred to as "issue

preclusion," must establish[2]:

> (1) an identity of issues (that is, that the issue sought to be precluded is the same as
> that which was involved in the prior proceeding); (2) actuality of litigation (that is,
> that the point was actually litigated in the earlier proceeding), (3) finality of the
> earlier resolution (that is, that the issue was determined by a valid and binding final
> judgment or order), and (4) the centrality of the adjudication (that is, that the
> determination of the issue in the prior proceeding was essential to the final
> judgment or order).

*Ganzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir. 2005).

When, as in this case, a plaintiff seeks to invoke non-mutual collateral estoppel the Court

should consider the following additional public policy concerns: (1) offensive issue preclusion

does not necessarily promote judicial economy because plaintiffs can adopt a "wait and see"

approach, that is, they can rely on a prior judgment against a defendant, but not be bound if the

defendant wins; (2) a defendant may not have presented a vigorous defense in a prior action

---

[2] Where a "plaintiff[] seek[s] to use issue preclusion to tie the defendant['s] hands with an adversely decided issue from a previous case, the use of collateral estoppel is deemed 'offensive'." *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 573 (1st Cir. 2003).   "Non-mutual" offensive collateral estoppel occurs when a plaintiff seeks to prevent a defendant from relitigating an issue which that defendant previously unsuccessfully litigated against a different party. *Id.*

because the damage exposure may have been nominal; (3) offensive issue preclusion may be unfair where the judgment relied on by the plaintiff as the basis for estoppel is inconsistent with other prior judgments in favor of the defendant; and (4) offensive issue preclusion may be unfair if the subsequent action affords the defendant procedural opportunities which were unavailable in the prior action that could lead to a different result. *In re Light Cigarettes Marketing Sales Practices Lit.*, 691 F.Supp.2d 239 (D.Me. 2010)(citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645 (1979)).

In *Hackert*, a federal jury New York entered a verdict in which it found that the design of the ionization only smoke alarm manufactured by BRK was defective and that BRK was negligent in failing to use ordinary care in the design, testing, marketing and sale of the ionization only smoke alarm. *See Hackert v. First Alert, Inc.*, 271 Fed.Appx. 31 (2[d] Cir. 2008)(affirming judgment).   Plaintiff argues that based on the *Hackert* jury's findings, as a matter of law, this Court should enter summary judgment in her favor on the issue of whether the design of the ionization smoke detector present in Ms. Champagne's residence on the night of the fire was defectively designed and on the issue of whether BRK was negligent in failing to use ordinary care in the design, testing, marketing and sale of said smoke detector.   For the following reasons, I disagree.

Plaintiff's argument fails on the first prong of the four part test, *i.e.*, establishing identity of issues.   This is because her argument is fundamentally flawed.   The *Hackert* case was decided under New York law. *See Hackert*, 271 Fed.Appx. at 32 (jury found in favor of plaintiff under New York law of negligence and products liability).   Nowhere in her submissions does Plaintiff assert that Massachusetts' breach of warranty and negligence law is the same as the New York law which was applied in the *Hackert* case.   It may well be that the law is, in fact, the same, however,

Plaintiff has the burden of proof on this issue and it her responsibility to review the law of the two

jurisdictions and satisfy the Court that they are sufficiently similar to establish an identity of the

legal issues between the *Hackert* case and the instant case.   Inexplicably, she has failed to make

this correlation; indeed, her brief does not include a single citation to Massachusetts substantive

product liability law[3].   Additionally, as pointed out by BRK, there are several verdicts from other

jurisdictions in which the jury has determined that the ionization smoke alarm was not defective

and BRK was not negligent with respect to its design, testing, marketing and sale. *Def BRK*

*Brands, Inc.'s Opp. To Pl's Mot. For Part. Sum. J.* (Docket No. 80), at pp. 11-13 and cases cited

therein.   Based on these findings, it is not necessary for me to examine whether Plaintiff has met

her burden with respect to the other requirements for applying offensive collateral estoppel.

Based on public policy and considerations of fundamental fairness, I find that offensive

collateral estoppel should not apply in this case.   Therefore, Plaintiff's motion for partial

summary judgment is denied.

### *BRK's Motion For Summary Judgment*

BRK seeks summary judgment with respect to all claims against it on the grounds that

Plaintiff's claims are speculative and/or there are insufficient facts in the record to support such

claims.   Plaintiff, on the other hand, argues that her claims are not based on mere speculation and

that there are genuine issues of material fact which preclude summary judgment.

Initially, I will summarize the applicable substantive law.   It is undisputed that

Massachusetts law applies in this case.

---

3 Defendant asserts that Massachusetts substantive law differs from New York law.   However, because I
have found that Plaintiff has failed to satisfy even the most basic requirement with regard to meeting her burden of
proof on this issue, it is not necessary for me to resolve whether the applicable products liability laws of the two
jurisdictions are identical.

*Plaintiff's Negligence and Breach of Warranty Claims For Defective Design, Manufacture, Testing, Marketing and Sale of the Ionization Only Smoke Alarm.*

Plaintiff has asserted a claim against BRK for the negligent design, manufacture, testing, marketing and sale of the ionization only smoke detector unit in question.   There are four elements to a negligence claim: "(1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff." *See Delaney v. Reynolds,* 63 Mass.App.Ct. 239, 241, 825 N.E.2d 554 (2005).   Summary judgment is rarely granted in negligence actions; however, it is appropriate if "a plaintiff has no reasonable expectation of proving that 'the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct.' " *Hebert v. Enos,* 60 Mass.App.Ct. 817, 820-821, 806 N.E.2d 452 (2004), quoting *Kent v. Commonwealth,* 437 Mass. 312, 320, 771 N.E.2d 770 (2002). Negligence questions may be decided as a matter of law "where no rational view of the evidence would warrant a finding of negligence." *Glick v. Prince Italian Foods of Saugus, Inc.,* 25 Mass.App.Ct. 901, 902, 514 N.E.2d 100 (1987).

In a breach of warranty/defective design case, the plaintiff must prove that the product as designed was not "fit" for ordinary usage because of a defect making it "unreasonably dangerous." In determining whether a plaintiff has met this burden, the factfinder must consider: "among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' " *See Colter v. Barber-Greene Co.*, 403 Mass. 50, 57, 525 N.E.2d 1305, 1310 (1988) (citation to quoted case omitted).

13

" 'Ordinary purposes,' refers to a product's intended and foreseeable uses[;] 'Fitness' is a question of degree that primarily, although not exclusively, concerns reasonable consumer expectations.   Both 'ordinary purposes' and 'fitness' are concepts that demand close attention to the actual environment in which the product is used." *Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 746-47 (2006) (internal citations and citations to quoted cases omitted).   "[T]he manufacturer will be liable if its 'conscious design choices' fail to anticipate the reasonably foreseeable risks of 'ordinary' use. Thus, warranty liability may be imposed even where the product was properly designed, manufactured, or sold; conformed to industry standards; and passed regulatory muster, and even where the consumer used the product negligently." *Id.*, at 747-48, 847 N.E.2d 315.

The inquiry in a breach of warranty/defective design case "focuses on the product's features, not the seller's conduct." *Id.*, at 747, 847 N.E.2d 315.   "[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Id.* (citation to quoted case omitted). As with her negligence claim, the Plaintiff must establish that the design defect was the proximate cause of Ms. Champagne's death.

BRK argues that there is no competent evidence to establish that ionization only smoke detectors are defective and therefore, it was not negligent in the design, manufacture, testing, marketing and/or sale of the 86ARC ionization smoke alarm in question, nor did it manufacture a product which was unreasonably dangerous.   In support of its position, BRK points out that: (1) the smoke alarm unit in question was not properly located, which would have effected when the smoke reached the alarm and therefore, when it would respond; (2) there is no evidence as to when the smoke alarm sounded (the evidence is clear that it did sound at some point); (3) there is no

14

evidence as to extent of the fire, smoke, hear or gases produced, or the location where produced; and (4) there is no evidence as to Ms. Champagne's movements or actions relating to the fire. Plaintiff, on the other hand, argues that there is sufficient evidence from which the jury can find that the ionization only smoke detector in this case was defective (because it sounds less quickly during smoldering fires and this was likely a smoldering fire), and that there is sufficient evidence from which the jury can infer that the failure of the smoke alarm to sound in a timely fashion led to Ms. Champagne's death.

A more protracted discussion of the parties' arguments would serve no useful purpose. Suffice to say, BRK makes a compelling argument that on the current record, the evidence on the issues of defect and causation is so lacking, that summary judgment is warranted as to Plaintiff's negligence and warranty based defective design claims.   Plaintiff, on the other hand, has pointed to evidence in the record from which the jury can make inferences that satisfy the necessary elements of her claim.   Some of those inferences require a leap of faith on the part of the factfinder; nonetheless, the Court cannot find as a matter of law that no reasonable jury could find for the Plaintiff.   However, I caution the Plaintiff that the links that jurors will have to make in order find in her favor, particularly with respect to her negligence claim, are, at best tenuous, and if the evidence admitted at trial does not concretely establish all of the elements of her claims, then judgment shall enter for BRK.

*Claims for Failure to Provide Adequate Warning*

Plaintiff also asserts claims against BRK for negligent failure to warn, breach of warranty/failure to warn and misrepresentation.   Essentially, "negligent failure to warn and failure to warn under breach of warranty are to be judged by the same standard: the reasonableness

15

of the defendant's actions in the circumstances." *Hoffman v. Houghton Chem. Corp.,* 434 Mass. 624, 637, 751 N.E.2d 848 (2001).

In a negligent failure to warn case, the manufacturer's duty can be described as follows: the manufacturer is under a duty to warn those who will foreseeably come into contact with a product which it (the manufacturer) knows or should know is dangerous. *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135, 475 N.E.2d 65 (1985).   Furthermore, Massachusetts law recognizes that a product can be "defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings ... and the omissions of the instructions or warnings renders the product not reasonably safe." *Vassallo v. Baxter Healthcare Corp.,* 428 Mass. 1, 21, 696 N.E.2d 909 (1998)(citation to quoted case omitted).   The warning must be "comprehensible to the average user and ... convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." *MacDonald,* 394 Mass. at 140, 475 N.E.2d 65 (citation to quoted case omitted).   If an adequate warning is supplied, a presumption arises that it will be read and followed. *Knowlton v. Deseret Med., Inc.,* 930 F.2d 116, 123 (1st Cir. 1991); *Cottam v. CVS Pharm.,* 436 Mass. 316, 327, 764 N.E.2d 814 (2002).

Additionally, "a manufacturer's duty of care includes an obligation, whenever possible … to provide an adequate warning of the latent dangers arising from the normal and intended use of the product.   A manufacturer of a product, which lacks the requisite warning, is, by virtue of that deficiency, in breach of an implied warranty of merchantability. However, a manufacturer has a duty to warn only as to those dangers about which the manufacturer actually knew or about which it reasonably should have known."   *Welch v. Keene Corp.*, 31 Mass.App.Ct. 157, 575 N.E.2d 766 (1991) (internal citations omitted).   A failure to give adequate warnings, however, will not

16

establish negligence where the lack of such warnings is not the proximate cause of a plaintiff's injuries. *Laaperi v. Sears, Roebuck & Co.,* 787 F.2d 726, 730 (1ˢᵗ Cir. 1986).

As BRK point out, there is simply no evidence in the record concerning the issue of whether Ms Champagne ever read any of the warnings and/or instructions that accompanied the smoke alarm at issue in this case.   Plaintiff argues that it is irrelevant whether Ms. Champagne read the instructions that accompanied the smoke alarm unit because the instruction/warning which was provided was inadequate because it did not warn her of possibility that the ionization technology contained therein could have a delayed response to smoldering fires.   She further argues that the presumption that she would have read and followed an adequate warning is enough to withstand summary judgment.   I disagree.

In this case, the smoke alarm unit at issue contained an instruction which advised that smoke alarms be put in each bedroom—there was no smoke alarm in Ms. Champagne's bedroom. The instruction manual that came with the 86ARC smoke alarm contained an express warning about smoking in bed.   Additionally, inside the alarm, in the battery compartment in orange and black letters, it states that the alarm should be replaced by 2005; the fire occurred in 2007.   The inference being that Ms. Champagne did not adhere to warnings and/or instructions that were in fact provided with the smoke alarm unit in question.   For this claim to stand, I would have to find that if the 86ARC ionization smoke alarm in question had included a more detailed warning of the potential delay in sounding the alarm in the case of a smoldering fire, Ms. Champagne would have replaced the smoke alarm with a photoelectric sensor alarm or dual sensor alarm.   There is simply no evidence in the record to support such a finding.   As to Plaintiff's misrepresentation claim, there is not a scintilla of evidence which would establish that Ms. Champagne relied on any statements made by BRK.

17

Plaintiff's case requires that the fact finder make numerous leaps of faith in order to find that a defect in the smoke alarm unit resulted in Ms. Champagne's death.   At some point, the number of leaps and the rank speculation required to make those leaps establish, as a matter of law, that the evidence is insufficient to sustain a claim.   Such is the case with respect to Plaintiff's failure to adequately warn claims.   Based on the record before me, I cannot find that a reasonable jury could rule in Plaintiff's favor as to these claims.   Therefore, summary judgment shall enter for BRK on Plaintiff's claims for negligent failure to warn, for her breach of warranty claims for failure to warn and for her misrepresentation claim.

*Punitive Damages*

Plaintiff has asserted that should BRK be found liable for Ms. Champagne's death as the result of its negligence and/or breach of warranty, it should be subject to punitive damages. A protracted discussion of this issue is not warranted.   As aptly summarized in BRK's submissions, even if the jury were to find that the ionization only smoke detector at issue in this case was defective because it was unreasonably dangerous, there is simply no evidence to support a finding that BRK's conduct was malicious, willful, wanton or reckless, or that Ms. Champagne's death was caused by its gross negligence. *See* Mass.Gen.L. ch. 229, §2.   Therefore, summary judgment shall enter for BRK on the issue of punitive damages.

## Conclusion

It is hereby Ordered that:

(1) Plaintiff, Jamie Connell's, Administratix of the Estate of Karen Champagne, Motion for Partial Summary Judgment on Collateral Estoppel Grounds as to BRK's Negligence and the Defectiveness of BRK Ionization Smoke Detectors (Docket No. 63) is ***denied***, and

18

(2) Defendant BRK Brands, Inc.'s Motion for Summary Judgment (Docket No. 72) is ***allowed***, in part, and ***denied***, in part, as provided in this Memorandum of Decision and Order.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**